L. W. WALKER, Appellant, v. JOINT DRAINAGE DISTRICT No. 2 OF OSCEOLA AND DICKINSON COUNTIES et al., Appellees (and six other cases).

**DRAINS:** Original Construction (?) or Repair (?)   The term "repair"
1   does not embrace the construction of an entirely new tile drain 2,100 feet long, and parallel to and 900 feet distant from an original drain, when the new drain is constructed for the purpose of draining land not drained by the originally constructed drain because of the defective plan thereof; nor may it be said that such new construction is an improvement of the "outlet" of the original improvement.

**DRAINS:** Original Construction (?) or Repair (?)   The term "repair"
2   embraces the relaying of defectively laid tile. It may also embrace the abandonment of a line of defectively laid tile and the laying of an entirely new line of tile immediately adjacent and parallel to such defective line.

*Appeal from Osceola District Court.*—WILLIAM HUTCHINSON, Judge.

FEBRUARY 12, 1924.

SEVEN appeals from an assessment for benefits in a drainage district were consolidated for trial, and are so submitted on this appeal. The trial court confirmed the assessment for benefits as made by the boards of supervisors.—*Affirmed in part; reversed in part.*

*Heald, Cook & Heald,* for appellant.

*Clark, Dwinnell & Meltzer,* for appellees.

FAVILLE, J.—I.  Joint Drainage District No. 2 of Osceola and Dickinson Counties was duly established in November, 1913. The improvement provided for was constructed and an assess-

**1. DRAINS: original construction (?) or repair (?)**

ment to cover the costs of construction was confirmed in July, 1914.  The improvement consists of a main tile, having a total length of 19,600 feet, with numerous branches, or laterals, connecting with it.  In this case we are only concerned with two of these branches.  The accompanying plat will help to an understanding of the questions involved.

As shown thereon, there was originally constructed Branch No. 126, starting at Station 126 on the main line, and extending to Station 47.  From said branch there extended southward

Branch 126-47, from Station 47 to Station 20. From Station 118 on the main line there extended Branch 118, which terminated at Station 5.

We take up first the matters involved in connection with Branch 126.

Branch 126 and Branch 126-47 were constructed according to the original plans and specifications, extending from Station 126 on the main line in a general southwesterly and southerly direction to Station 20. The tile system as so constructed was found inadequate to furnish drainage to the east half of Section 35, and the boards of supervisors employed an engineer to examine the premises and to make report, which was done; and subsequently the boards of supervisors ordered the construction of what is shown on the plat as Branch 126-40, starting at Station 40 on Branch 126 and extending in a general southerly and southwesterly direction, its terminal point being about 350 feet north and east of Station 20 on Branch 126-47. There is evidence in the record in great detail regarding the construction of the original lateral south of Station 47 and the necessity of the construction of the new lateral, 126-40, to adequately drain the east half of Section 35. It is contended that it was originally planned that a pond lying east of Branch 126-47 should be tiled westward into said branch, and that it was discovered that the tile as laid in Branch 126-47 were too shallow to permit drainage of the said pond in that manner. The newly constructed branch, 126-40, as shown on the plat, passes directly through the pond in question, and furnishes adequate drainage therefor to the north, and has its outlet in Branch 126 at Station 40.

Briefly stated, it is the contention of appellants that the construction of Branch 126-40 is not a repair of any portion of the original improvement, but is the construction of an entirely new and separate improvement, and that appellants cannot be assessed therefor without notice as provided by the statute.

All of the lands lying within the drainage district in the east half of Section 35 were classified and assessed for the construction of the original improvement. Code Supplement 1913, Section 1989-a21, provides that, after a drainage improvement has been constructed, it shall be under the supervision of the

board of supervisors, and "it shall be the duty of the board to keep the same in repair and for that purpose they may cause the same to be enlarged, reopened, deepened, widened, straightened or lengthened for a better outlet, and they may change or enlarge the same or cause all or any part thereof to be converted into a closed drain when considered for the best interests of the public rights affected thereby."

The work authorized by this section may be done without notice to landowners whose lands have been classified and assessed for the construction of the original improvement. *Breiholz v. Board of Supervisors,* 186 Iowa 1147.

If the construction of Branch 126-40 comes within the purview of said Section 1989-a21, then appellants were not entitled to any notice. If it is a new improvement, and not within the provisions of Section 1989-a21, then, since they received no notice of such proposed improvement, the assessment of appellants' lands therefor is void.

Branch 126-47 extends southward from Station 47 about 2,000 feet. The newly constructed branch, 126-40, which is somewhat parallel the greater part of its length to Branch 126-47, extends southward from Station 40 about 2,100 feet. The pond through which the newly constructed branch, 126-40, extends, is approximately 900 feet east of Branch 126-47. The pond contains about six acres. The evidence tends to show that it was contemplated that the original branch, 126-47, would furnish adequate drainage for all of the lands lying north and east of Station 20 in Section 35.

It appears from the evidence that the original improvement was constructed in accordance with the plans and specifications adopted by the boards of supervisors at the time of the establishment of the district, and that the assessment was made against the tracts of lands for the cost of the construction of the improvement as so established. That Branch 126-47 failed to adequately drain the lands adjacent to it in the east half of Section 35 was due, not to defective work in constructing the improvement, but to a defect in the plan itself. The lateral would not adequately drain the lands because it was planned in a defective manner, in providing for too small tile and for too flat a grade. The "repair" that became necessary because of

the condition was not a "repair" of the physical improvement as made upon the land, but it was a "repair" of the plan of the engineer who designed the original improvement which was adopted by the board of supervisors. In other words, the original plan for the drainage of this tract of land was inadequate and insufficient to do the work.

In order to furnish adequate drainage for the lands in this area, it became necessary either to modify the original plan by digging up the tile and laying a larger tile and at a greater depth, or to adopt some entirely new plan of drainage. There is evidence tending to show that it was determined by the board of supervisors, upon an investigation and report to them by an engineer, that it was cheaper and more efficient to leave the existing improvement and construct the new branch, 126-40, of a larger tile and with a greater fall, and laid through the pond previously referred to, and uniting with Branch 126 at Station 40. The question that confronts us at this point is whether the construction of Branch 126-40, under these conditions and for this purpose, may be properly said to be a "repair," under Section 1989-a21, or the enlargement, reopening, deepening, widening, straightening, or lengthening of the original drain for a better outlet.

We have had said section before us for consideration in numerous cases. We do not think that it can be said that the construction of Branch 126-40, under these circumstances, is in any proper sense a "repair" of the work of the original construction of the drainage system. There is no attempt at replacement or any repair, modification, or change of any kind in the original tile as constructed. As before stated, the thing that is repaired is the *plan,* and not the constructed system. To repair means "to restore to a sound or good condition after decay, injury, dilapidation, or partial destruction." *American Bonding Co. v. City of Ottumwa,* 137 Fed. 572. See, also, *Dougherty v. Taylor & Norton Co.,* 5 Ga. App. 773 (63 S. E. 928); *Walker v. City of Detroit,* 143 Mich. 427 (106 N. W. 1123); *Brown County v. Keya Paha County,* 88 Neb. 117 (129 N. W. 250).

The construction of this new tile drain 2,100 feet in length some 900 feet distant from the original tile and nearly parallel

thereto and furnishing drainage for an entirely new area of land not drained by the original tile is not in any proper sense a "repair" of the original construction. If such a new lateral can properly be said to be a "repair," then why need the boards of supervisors have provided for any laterals in Section 35? Why not have stopped at Station 47, and then later put in both Lateral 126-47 and Lateral 126-40 as "repairs?" They are both needed to complete the system and furnish adequate drainage to the lands in question. The word "repair" is not of sufficient elasticity to permit extension to include work of this character.

Can it be said that the construction of this tile is an enlarging, reopening, deepening, widening, straightening, or lengthening of the improvement for a better outlet? Appellees lay great stress upon the case of *Mathwig v. Drainage District*, 188 Iowa 267, wherein we said:

"The word 'outlet,' as used in this section, manifestly includes more than the final outlet of the entire system. The tile ditch which it is proposed to enlarge empties into a large open ditch, which forms the outlet for all of the drainage of the district; but the tile in question forms the outlet for the several laterals mentioned, and a large amount of surface water accumulating in the vicinity thereof. That same is inadequate to carry the water is shown without dispute in the record. The effect of the proposed improvement is to enlarge this outlet; and, it seems to us, it clearly comes within the provisions of Section 1989-a21."

In *Kelley v. Drainage District*, 158 Iowa 735, referring to said Section 1989-a21, we said:

"Whether such enlargement of the outlet be effected by widening and deepening the existing ditch or excavating another parallel with it, or whether this be done by removing tile and replacing it by that of larger size, or by laying another tile drain parallel with that already laid, can make no difference; for, in either event, the result is the enlargement of the outlet which is here authorized, and the costs of which are to be assessed as subsequently directed in the same section. It is enough for the purposes of this case, however, that the proceedings were authorized by and in pursuance of the statute first quoted."

But these and other similar cases are not warrant for the

action of the boards of supervisors in circumstances such as are disclosed in the case at bar.

An "outlet" must be an "outlet," and not an independent lateral constructed for the sole purpose of draining lands not drained by the original improvement. The "outlet" that may be enlarged, reopened, deepened, widened, straightened, or lengthened, under Section 1989-a21, must be an *outlet* to some existing drainage system or some part thereof. True, as said in the *Mathwig* case, it need not be the final outlet of the entire system that may be so improved. There may be numerous outlets in a drainage system, either open or closed, that may need to be enlarged or otherwise improved, and this can be done under the provisions of said section. But the statute in this regard applies only to some form of outlet to an established drainage system or some part thereof. It is the *outlet* of the *drainage system* or a portion thereof that may be changed under this section; not the outlet for *lands* that have no previous drainage. In this case, Branch 126-40 in no way enlarged, reopened, deepened, widened, straightened, or lengthened any outlet of the original improvement or any part of it. It was simply an entirely new lateral, put in to drain wet lands not adequately drained by the original improvement. It was in no way connected with Branch 126-47. It did not affect its outlet in the least. It joined the common branch several hundred feet from the juncture of Branch 126-47 therewith. It had no more relation to any "outlet" for Branch 126-47 than to any other lateral on the system. It may have affected the flow of water through Branch 126-47, but it in no wise was a change of "outlet," under Section 1989-a21. Entirely new improvements of this kind cannot be constructed for the purpose of extending a drainage system to lands not provided for by the original plan, under either the guise of being "repairs" or being an improvement of an "outlet."

In *Smith v. Monona-Harrison Dr. Dist.*, 178 Iowa 823, we said:

"All this has reference to the completed drains, and we entertain no doubt that the trustees may enlarge, reopen, deepen, widen, or straighten any of these now in the district; and they may lengthen any of these, but only for the purpose of provid-

ing a better outlet. * * * The manifest design of the legislature, evidenced in the statute quoted, was to confer adequate authority to conserve all that had been done in the way of making the improvement, and, by definitely defining how this should be accomplished, to obviate any inference that additional improvements might be constructed and costs therefor incurred without organizing a district as before, and thereby affording those interested therein an opportunity to be heard.''

Appellant's lands could not legally be taxed for the cost of construction of Branch 126-40 without notice of the proceedings. The court erred in holding to the contrary. It is quite apparent from the record that no one in the district receives any benefit from the construction of Branch 126-40 except the owners of the tracts of land upon which the same is constructed. What method of assessment the board of supervisors should have adopted, by the creation of a subdistrict or otherwise, or what action, if any, may be proper in the premises, to equitably assess the proper tracts of lands for the construction of this improvement, are matters not involved in this appeal.

II. As to the work on Branch 118, an entirely different situation is presented. Under the record, the work done on this branch may properly be regarded as work of "repair." The evidence shows that on a portion of this branch the tile were poorly laid, and that they were washed out in several places, and were first on one side of the ditch and then on the other, and had more or less mud and dirt, and the joints were open. An examination of the tile disclosed that some were broken and could not be relaid. It was also found to be impracticable to take up all of the old tile, and that this could not be done without breaking them. About 200 feet of the old tile were taken up and relaid; then new tile were purchased. Then, for a distance of 1,400 feet, the line of the old tile was abandoned, and new tile laid close to and parallel with the old tile. This connected with the original tile of Branch 118 at each end, as shown by the dotted line on the plat.

2. DRAINS: original construction (?) or repair (?)

We think that all of this work came properly within the authority to "repair." In order to make the branch "whole" or to "restore" it, it was not absolutely necessary that all the defective and broken tile should be removed and others laid in

their place. This was done in this instance, so far as it was practicable to do so. When it was found impracticable to dig up the old tile and replace them with new, the new tile were laid in a new ditch immediately adjacent to the old one and parallel thereto, and these new tile connected with the old line of tile at each end.. This was no more than a restoration of the original line of tile that had become broken and out of line and practically worthless. It was simply a more efficient and expeditious manner of repairing the old line than to have actually dug it up and replaced it. It also appears to have been less expensive. No new lands are drained. We think that such a method of repair is clearly within the powers of the board of supervisors, under the provisions of Section 1989-a21.

The court should have canceled the assessment of appellants' lands for the cost of construction of Branch 126-40 and confirmed the remainder of the assessments as made by the boards of supervisors. The cause will be remanded for a decree in accordance with this opinion. It is so ordered.—*Affirmed in part; reversed in part.*

ARTHUR, C. J., EVANS and PRESTON, JJ., concur.