LEWIS HOGUE, Appellee, v. MONONA-HARRISON DRAINAGE DISTRICT et al., Appellants.

No. 45426.

1152

FEBRUARY 11, 1941.

Prichard & Prichard, for appellee.

Underhill & Underhill, for appellants.

BLISS, J.—The Monona-Harrison Drainage District is a large district located in the two counties comprising its name.

It was established in 1904. The main ditch extends in a general north and south direction about a half mile west of, and about parallel to the Little Sioux River, until they empty into the Missouri River to the south and west in Harrison county. It is under the supervision of a board of trustees. Hogue Creek is a natural stream running about due west from the hills on the east in Monona county and emptying into the Little Sioux River a short distance north of the Harrison county line. The natural slope of the ground is to the west and south.

The plaintiff is the owner of 960 acres of land lying in four different sections, about a half mile east of the Little Sioux and extending back into the hills. But a small part of this land is in the drainage district. Between the buildings on his land, and the river, and about 3,000 feet east of the river, and parallel to it, is a north and south road. Between the plaintiff's land and the river to the west is the McDonald and the Poitevin lands, bordering on the Little Sioux. The Hogue Creek or ditch, as it is sometimes called, is about 20 feet wide at the road, and 60 feet wide at the river.

When the drainage improvement was originally constructed no work was done on the Little Sioux River. But in 1928, to more fully effect the benefits to the district generally, the river was cleaned out, and the dredgings and dirt from adjoining land were used to construct dikes on each side of the river, above and below the mouth of Hogue Creek. Plaintiff's father, who then owned the land of plaintiff, and McDonald and Poitevin, protested against the building of the dikes along the river, unless their lands were in some way protected from this interference with the natural drainage, and from the floodwaters which would be backed up Hogue Creek by the dikes. A written agreement was then made between the objectors and the trustees of the district that the latter would construct dikes on each side of Hogue Creek for 1,000 feet from its mouth, if the objectors would extend the dikes at their own expense for 2,900 feet further east along the creek. These dikes to be constructed by both parties were to be built a foot higher than the river dikes. This agreement was carried out by full performance by all parties. The drainage district records show the proceedings respecting this agreement. The dike so constructed along the creek afforded

effective flood protection during the years following. It had cost the private owners $1,500. This money was paid to the district. In 1938, the district dredged out the Little Sioux and used the dredgings and earth from the adjoining land to raise the dikes along the river four and one-half or five feet above their former height. No floodgates or protection of any kind were placed at the mouth of the creek to prevent the excess floodwaters from backing up the creek and flowing over the dikes. During the March floods in 1939, the water came up Hogue Creek from the Little Sioux and washed out the dikes in places, and overflowed them, and flooded the McDonald and the Poitevin lands, and a part of plaintiff's land. Two hundred eighty-four acres of the McDonald land, and about forty acres of plaintiff's land were flooded. The elevation of the dikes along the river greatly decreased the efficiency of the creek dikes, constructed under the 1928 agreement, as a flood protection for the future. The plaintiff and the owners of the McDonald and Poitevin lands then proposed to the trustees that the river dikes be lowered or the creek dikes be increased to the height of the river dikes, and they offered to pay the expense of constructing the latter dikes commencing at a point 1,000 feet east of the river to the highway to the east, a distance of 2,000 feet, if the district would pay the expense of the improvement for the first 1,000 feet east from the river. The total cost was estimated at $1,200. The trustees refused to accept the proposal, and this suit was then begun.

The petition recited with greater particularity the matters which we have set out above, and prayed that the defendant district, through its trustees, be ordered to lower the river dikes to the height of the creek dikes, or to the level provided by the contract of 1928, or to construct a floodgate at the mouth of the creek, or to raise the creek dikes to the height of the river dikes. General equitable relief was prayed. Defendants, by motion to dismiss, which was overruled, and by answer, alleged that the district and the trustees had no authority or power to comply with the demands of plaintiff.

There is substantial evidence to sustain the matters of fact herein stated and alleged in the petition. The trial court so found and decreed. It also found that the diking of the Little Sioux River both in 1928 and in 1938 was a proper exer-

cise of the powers of the drainage district in effecting the object of its establishment, and that in consequence thereof it was the duty of the district to protect the opening of the natural watercourse, Hogue Creek, from floodwaters caused by diking the river, and that the diking of the creek under the contract of 1928 was a proper fulfillment of that duty. The court decreed that a similar duty was incumbent upon the district because of the damages which would result to plaintiff by reason of raising the dikes in 1938. The court after discussing the alternative methods of relief suggested by plaintiff said:

"The court further finds that the method adopted or to be adopted for protection against said flood waters and the protection of the land of the plaintiff and other adjacent land from being flooded as aforesaid is a matter within the power and jurisdiction of the trustees of the drainage district in the exercise of their sound discretion with and under the advice and recommendations of the engineers for the drainage district. However, it is the duty of the trustees to exercise due care, attention and diligence in whatever procedure or method is adopted as aforesaid, to the end that the method be efficient and fulfill the requirements and purposes of the improvement desired and that it affords protection to the plaintiff's land and the land of the adjacent land owners from flood waters as aforesaid.

"It is, therefore, ordered, adjudged and decreed that the defendant district and its said trustees be and they are hereby ordered to provide proper protection to the land of the plaintiff and other adjoining land as aforesaid from flood waters escaping from the Little Sioux River through the opening or outlet of Hogue creek or ditch, as hereinabove set out, by diking the banks of Hogue creek to a height equal to the present dikes along the banks of the Little Sioux River back from said river for a distance of about 1000 feet, or by erecting a flood gate at the mouth of said Hogue creek where the same empties into the Little Sioux River suitable to carry the waters naturally coming down said Hogue creek and to protect Hogue creek from overflowing its dikes because of flood waters from the Little Sioux River as aforesaid, or by some other proper and appropriate method or plan, if any there be, under the directions and recom-

mendations of the engineers for the drainage district and in the exercise of due care and attention and sound discretion on the part of the trustees of the drainage district, to the end that the flood waters from the Little Sioux River shall not escape through the hole left in the dike along the Little Sioux River at the mouth of said Hogue creek as aforesaid and flood the land owned by the plaintiff and other land adjacent to Hogue creek and thereby cause damage to the said land and crops thereon.

"And it is further ordered, adjudged and decreed that the court shall and does hereby retain jurisdiction of this cause for further hearing on proper application or for further order herein to the end that proper and appropriate steps be taken by the trustees within a reasonable time after the filing of this decree to correct the matters and conditions complained of in plaintiff's petition and to prevent future flood damage from occurring to plaintiff's said land and adjoining lands as alleged in plaintiff's petition."

The decree of the able trial court, whose lamented passing was but a short time ago, in our judgment, is sound in law and in fact. Appellants contend that any work done upon Hogue Creek is beyond the original plans and specifications of the improvement as established, as shown by the original blueprint. The record, as presented to us, gives no information of any importance as to the territory embraced in the district, the mains, laterals, or any other facts relative to the improvements planned. So far as the record shows, no dikes were originally planned for the Little Sioux River. None were constructed on its banks in the vicinity of Hogue Creek, from the establishment of the district in 1904 until 1928. Appellants make no claim that the building of those dikes was ultra vires. It was the building of these dikes that made necessary the creek dikes. Appellants urge that the trustees had no legal right to do any drainage work on any stream not embraced within the original plan.

Appellants contend that any improvement contemplated by the plaintiff could be effected only by compliance with section 7554 of the 1939 Code. This section, in substance, provides that where an established drainage district is insufficient to properly drain the tributary lands, a petition, as for the establishment of

an original district, may be filed to establish a new district including the old. We do not agree with such contention.

It is the claim of the appellee that any relief he is asking may be supplied under the provisions of Code section 7556. The question of what is a "repair" under the latter section has been before this court many times. The answer depends always upon the circumstances in each case. Here we have little information as to either the original or subsequent plans of the drainage improvement. Appellants urge that the original blueprint shows no artificial lateral where Hogue Creek is located. There apparently was no reason for one. The creek was a natural watercourse which with the Little Sioux River afforded sufficient outlet for the tributary lands, until the construction of the dikes along the river. As stated by the engineer witness for appellants: "The flood problem on the Little Sioux River has been a concern to the people for a long time. * * * They are endeavoring to get the water from the Sioux watershed into the Missouri River *without flooding the land.*" That was, no doubt, the purpose of constructing the river dikes in 1928. They could hardly have been included in the 1904 plans. In any event, the record before us does not so show. Since they were in part built from clean-out material taken from the river, to afford a better outlet, they could properly be classified as "repairs" under Code section 7556. We have held that "the word 'outlet,' as used in this section, manifestly includes more than the final outlet of the entire system." Mathwig v. Drainage District, 188 Iowa 267, 269, 171 N. W. 125, 126. See also Walker v. Joint Drainage District, 197 Iowa 351, 357, 197 N. W. 72, 74. But whether the work was "repairs" or not, appellants concede that the trustees had full authority to do the work. The dikes were for flood protection. But because no floodgates were placed at the mouth of the creek, and no other protective measures were there taken, the floodwaters backed up the creek and overflowed the immediately adjacent McDonald land, and the Poitevin and Hogue lands, just beyond. The dikes failed in their intended purpose. They would not have failed if floodgates had been placed at the mouth of the creek. If the trustees had authority and power to build the river dikes, it could not well be urged

that they had no authority to build floodgates, since they were a part of the dike system, and necessary to make the system effective. The record discloses that the construction of such floodgates would have been much more expensive, than effecting their purpose by diking the creek. When the adjacent owners insisted upon protection from overflow, the then trustees recognized the justice of their protest, because the dikes prevented the natural drainage of their lands into the river, and caused the backing up of the water upon their lands. The contract of 1928 was then entered into. The work was performed under direction of the district's engineer, and by the district. The landowners simply paid their money to the district. The creek was one of the outlets for a part of the drainage of the district. It was a natural watercourse but had become filled somewhat. The district straightened the creek, dredged it and cleaned it out with a dragline. It accomplished two beneficial results in doing this. It made the creek a better outlet, and it also supplied dredgings to help build the creek dikes.

The straightening, dredging, and diking of the creek were all properly "repairs" under section 7556. Had this watercourse been an artificial drain, appellants concede that the work would have been "repairs." The fact that the watercourse was a natural one does not change the statutory character of the work. Since the existence of the natural watercourse made unnecessary the construction of an artificial one, any work necessary to keep the natural course in repair, and make it better serve the district must be called "repairs" under the statute. As a matter of fact, the dikes along the creek were in reality but a part of the diking system along the river, to supplement it and make it a more effective protection for the land along the river. If the river dikes were authorized, those along the creek were necessarily authorized. From the records of the distict were introduced a cross-section drawing of the dredging done on the creek, and also the engineer's statement of the cost. No objections were ever made against what was done, so far as the record shows. The district had the benefit of the money paid in under the terms of the contract.

What we have said about the work in 1928 applies in every

respect to the present controversy. The raising of the river dikes on the river in 1938 defeats everything accomplished in building the creek dikes in 1928. The protection now asked by the plaintiff for himself and Mrs. McDonald and Mrs. Poitevin is nothing more than "repairs" made necessary by raising the river dikes, and the work ordered by the court is not only within the power and authority of the trustees, but it is their duty and obligation.

This court in the early drainage district case of Yeomans v. Riddle, 84 Iowa 147, 159, 50 N. W. 886, 890, expressed itself in support of the appellee's position, in 'the following language:

"The repair of a ditch may involve work to be done elsewhere than in or at it. Embankments or walls may be required, and material therefor may be obtained away from the ditch, or a new channel to straighten the old one may be made, and the like, which are rendered necessary by the action of floods or by other causes. The ditch is not expected to excel all the works of man by being perfect from the beginning. Its faults and imperfections may be removed by subsequent repairs or changes, until it attains that measure of usefulness which was the purpose of its builders."

This was in reference to a drainage district in Monona county. In speaking of section 1989-a21, Code Supplement 1913, now section 7556, the court, with reference to this drainage district, in Smith v. Monona-Harrison Drainage District, 178 Iowa 823, 826, 160 N. W. 229, 230, said that "it is plain that the supervision and control to be exercised by either body [supervisors or trustees] are not limited to what technically would be deemed making repairs, but include doing all that is authorized in this section to be done." In Meyerholz v. Board of Supervisors, 200 Iowa 237, 243, 204 N. W. 452, 454, we said:

"The levee was constructed upon certain lands adjacent to the river for a distance of approximately six miles. It is obvious that a levee, like a chain, is no stronger than its weakest part. It is a matter of common knowledge that a breach in the levee, or a washout at one point, may prove utterly disastrous to the farm lands protected by the levee. The purpose of the statute in ques-

tion was to provide for repairs caused by 'washout or other injury,' so as to make the levee efficient for the purpose for which it was constructed."

In Walker v. Joint Drainage District, 197 Iowa 351, 359, 197 N. W. 72, 75, the old lateral was repaired by laying a new tile line a short distance away. What we said there applies to the situation here, with respect to making the river dikes more efficient. The court said:

"It was simply a more efficient and expeditious manner of repairing the old line than to have actually dug it up and replaced it. It also appears to have been less expensive. No new lands were drained. We think that such a method of repair is clearly within the powers of the board of supervisors, under the provisions of Section 1989-a21."

As said in that case, and in Maasdam v. Kirkpatrick, 214 Iowa 1388, 1396, 243 N. W. 145, 148, the cost of the work contemplated, particularly as compared to the cost of the original improvement, is an important circumstance in the solution of any doubt as to whether the work is a repair. According to the testimony of an engineer for defendant, 23,000 cubic yards dredged from the creek would raise the dikes now along the creek to the present increased height of the river dikes. That is all the plaintiff asked for. The same witness said that he had been given a figure of four cents a cubic yard for excavating this dirt, which was a reasonable price. This would make the cost $920, of which the plaintiff and Mrs. McDonald and Mrs. Poitevin would pay three-fifths, or $552, and the district, $368. Other decisions supporting our conclusion, more or less directly or by analogy, are Board of Supervisors v. Paine, 203 Iowa 263, 210 N. W. 929; Simpson v. Board of Supervisors, 186 Iowa 1034, 171 N. W. 259; Breiholz v. Board of Supervisors, 186 Iowa 1147, 173 N. W. 1, 257 U. S. 118, 42 S. Ct. 13, 66 L. Ed. 159; Nelson v. Graham, 198 Iowa 267, 197 N. W. 905; Mathwig v. Drainage District, supra [188 Iowa 267, 171 N. W. 125].

Appellants have cited among others, Mayne v. Board of Supervisors, 208 Iowa 987, 223 N. W. 904, Kelleher v. Joint Drainage District, 216 Iowa 348, 249 N. W. 401, Maasdam v.

Kirkpatrick, 214 Iowa 1388, 243 N. W. 145, Meyerholz v. Board, supra [200 Iowa 237, 204 N. W. 452], Smith v. Monona-Harrison Drainage District, supra [178 Iowa 823, 160 N. W. 229], Chicago & N. W. R. Co. v. Board of Supervisors, 187 Iowa 402, 172 N. W. 443. These cases have little application. As said in the Kelleher case, the new plan "contemplated an entirely different and substituted system of drainage."

The work done in 1928 was not, and the work to be done will not be, the draining away of excess water, but a protection against floodwaters caused by the diking of the river. The diking of the river was for the general benefit of the district, but such benefit ought not be procured at the expense of and to the injury of another. Appellants state that "as against the taxpayers of the drainage district, plaintiff-appellee is desirous of obtaining drainage work to his own benefit with very little expense to himself, inasmuch as he has only a small amount of land in the drainage district on which he pays only a small drainage assessment." We find no fact basis for this statement. Appellee had very little, if any, need for the establishment of this district. He had natural drainage for almost his entire tract, by reason of the natural slope of his land to the river, and the outlet afforded him by the creek. The exclusion of almost all of his land from the district, and the smallness of his assessment is the best evidence of that fact. He is not asking for drainage, but for protection against the unlawful casting of floodwaters upon his land.

It is our judgment that the decree was proper and equitable, and that it should be, and it is affirmed.—Affirmed.

CHIEF JUSTICE and all JUSTICES concur.